# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEEE
# WESTERN DIVISION

| | | |
|---|---|---|
| NATIONAL BANKERS TRUST CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PEAK LOGISTICS, LLC, | ) | |
| SUMMITT TRUCKING LLC, | ) | |
| PACER TRANSPORTATION | ) | |
| SOLUTIONS  INC., | ) | No. 12-2268 |
| ZAPPOS.COM, INC., and | ) | |
| DECKERS OUTDOOR, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PEAK LOGISTICS, LLC, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANDY TRANSPORT, INC., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART PEAK LOGISTICS AND SUMMITT TRUCKING'S JOINT MOTION FOR SUMMARY JUDGMENT AS TO ANDY'S COUNTERCLAIMS

Before the Court is Defendant/Third-Party Plaintiff Peak Logistics ("Peak") and Defendant Summit Trucking Solutions' ("Summitt") Joint Motion for Summary Judgment as to Third-Party Defendant Andy Transport's Counterclaims (D.E. # 164).  Andy filed a Response opposing the Motion (D.E. # 171), to which Peak and Summitt filed a Reply (D.E. # 176).  For

the reasons stated below, Peak and Summitt's Joint Motion for Summary Judgment as to Andy's Counterclaims is **GRANTED IN PART, DENIED IN PART**.

**BACKGROUND**

The third-party litigation at issue stems from original litigation filed by National Bankers Trust ("NBT") against all Defendants. Peak then filed a third-party complaint against Andy (D.E. # 37), and Andy answered and counterclaimed against Defendants, including Peak and Summitt (collectively, "Movants"). (D.E. # 50). Andy alleges four counterclaims: (1) suit on sworn account; (2) fraudulent misrepresentation; (3) negligent misrepresentation; and (4) unjust enrichment. Each of these counterclaims alleges wrongful conduct on the part of Peak, for which, Andy argues, Summitt is also liable as Peak's alter ego. The Movants seek summary judgment on all four claims.

NBT is engaged in the business of factoring for motor carriers. (Pl.'s Compl. ¶ 1). NBT purchases its clients' accounts receivable at a discount and takes a security interest in its clients' assets to secure the purchase price. (*Id.* ¶ 15). NBT remits a portion of the purchase price, known as the "advance rate," at the time of purchase, reserving a portion of the purchase price as further security. (*Id.* ¶ 16). NBT releases the reserved funds to its clients once the shipper pays the account. (*Id.* ¶ 17). One such client was Andy. On August 15, 2011, NBT and Andy entered into a factoring agreement. (*Id.* ¶ 18). In October 2011, Peak began brokering shipments to Andy.[1] (Andy's Resp. to Statement of Undisputed Material Facts ¶ 3). A brokerage

---

[1] Defendant Pacer Solutions, Inc. ("Pacer") brokered loads of shoes that Defendant Zappos.com, Inc. ("Zappos") purchased from various suppliers. Pacer contracted with Defendant Summitt to carry some of these loads. Peak would then, in turn, broker some of these Summitt loads to other carriers, including Andy.

agreement between Peak and Andy is the subject of several of Peak's claims against Andy and Andy's counterclaims against Peak.

Andy's relationship with NBT, on the other hand, is governed by the parties' factoring agreement. Under the factoring agreement, Andy sold at least some of its receivables—including accounts that Peak owed to Andy—to NBT.[2] (*Id.* ¶ 2). NBT then advanced the funds as described above, taking and perfecting a security interest in those accounts. It also named as collateral a number of other Andy assets, including all of Andy's present and future accounts receivable. (*Id.* ¶ 5). The factoring agreement gave NBT, as assignee, the right to collect on at least some Andy's open accounts, although the parties dispute the number of accounts actually purchased.[3] (*Id.* ¶ 4). NBT notified Peak of its purchase of the accounts from Andy, triggering Peak's obligation to pay NBT what it originally owed Andy. (*Id.*).

On November 23, 2011, and January 5, 2012, Andy hauled two separate loads of shoes brokered by Peak. Both loads were stolen. (*Id.* ¶ 7). On November 28, 2011, after the first theft, a Peak representative sent an email to Andy stating that Peak "will not offset payment on previous or future loads transported by Andy Transport in lieu of the pending claim." (*Id.* ¶ 14). This became the subject of Andy's misrepresentation counterclaims.

Andy states that its insurer paid $250,000.00 on each of the two thefts, but that Peak had to pay $82,333.45 in excess of Andy's insurance coverage. (Resp. in Opp. to Mtn. for Summ. J. 3). While Andy's insurance claims were still pending, Peak began withholding payment on its open invoices with Andy, which affected both Andy and NBT. Peak continues to assert a right

---

[2] The parties disagree on which accounts Andy actually sold to NBT—and thus owned by NBT—and which accounts were taken as collateral for the accounts NBT actually owned.

[3] The amounts outstanding on the invoices, as well as the amounts "owed" to both NBT and Andy, are a further source of contention.

of setoff for the cargo loss *and* for the loss of business that it claims it incurred as a result of Andy's alleged breach of the brokerage agreement. (Statement of Undisputed Facts ¶ 11). When NBT did not receive payment on the factored receivables, it sued Peak on sworn account for $187,600.00. (Pl.'s Compl. ¶ 44). Peak then brought a third-party complaint against Andy, and Andy counterclaimed against the Defendants/Third-Party Plaintiffs, including Peak. Andy asserts four claims: (1) suit on sworn account; (2) fraudulent misrepresentation; (3) negligent misrepresentation; and (4) unjust enrichment. The Court denied Peak and NBT's Joint Motion to Approve Compromise and Settlement as Commercially Reasonable ("Joint Motion to Approve Settlement"), as the factoring agreement between NBT and Andy was unclear as to the issue of default and its consequences. The Movants now seek summary judgment on each of Andy's four counterclaims.

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] In reviewing a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party,[5] and it "may not make credibility determinations or weigh the evidence."[6] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a

---

[4] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014).

[5] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[6] *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

4

genuine issue for trial."[7] It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[8] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[9] When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[10] In this Circuit, the nonmoving party must "put up or shut up" as to the critical issues of the claim.[11] The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[12]

## ANALYSIS

### I. Suit on Sworn Account

#### A. The Parties' Arguments

Movants begin by addressing Andy's allegation of suit on sworn account. They essentially make the same argument as that of NBT and Peak in their Joint Motion to Approve Settlement. Pointing to Tennessee Code Annotated section 49-7-607, the Movants argue that the

---

[7] *Celotex*, 477 U.S. at 324.

[8] *Matsushita*, 475 U.S. at 586.

[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[10] *Id.* at 251–52.

[11] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[12] *Celotex*, 477 U.S. at 322.

"secured party" (NBT) may recover funds owed by an "account debtor" (Peak) to the "debtor" (Andy). Movants argue that "Andy sold its Peak invoices to NBT pursuant to Andy and NBT's factoring agreement. Accordingly, Andy has no right to payment on these invoices."[13] Movants argue that Andy has "no interest" in Peak invoices. Furthermore, they argue that if the Joint Settlement were approved, the doctrine of accord and satisfaction would bar Andy from any payment on the account.

Andy counters by arguing that NBT did not actually purchase at least some of the Peak invoices—at least $95,400.00 worth. Thus, Andy argues, it does have a right to payment from Peak on certain invoices. Due to chargebacks by NBT, Andy argues that it is "the true owner" of $329,726.84 worth of unpaid invoices. Furthermore, Andy argues that NBT cannot invoke its rights under section 49-7-607 unless there has been a default by Andy. Under the factoring agreement, Andy argues, it has not defaulted. Andy also addresses the Movants' argument of accord and satisfaction if the Court were to grant the Joint Motion to Approve Settlement.

Peak replies that even if Andy is not in default, NBT may still settle Andy's claims on Peak invoices. It points to section 47-9-607(a)(3)'s language allowing parties to agree that the section's enforcement mechanisms apply even if there has been no default. Then, Peak argues that paragraph 12 of Andy's factoring agreement, which allows NBT to offset any and all of Andy's accounts if "a Customer fails to pay NBT," means that Andy may not receive payment on the invoices. Peak argues that because all of Andy's accounts are NBT's collateral and because Peak did not pay NBT, NBT may now settle all of Andy's accounts.

---

[13] Mem. in Supp. of Mtn. for Summ. J. 7.

### B. Choice of Law

Neither party has briefed the choice of law as to Andy's claim for suit on sworn account. The nature of Andy's claim against Peak and Summitt is simple: Andy alleges that it is owed money for services it rendered to Peak. Andy and Peak's relationship is based on their brokerage agreement. The brokerage agreement provides that "in the event of any disagreement or dispute, the laws of [Indiana] shall apply."[14] Both the Movants and Andy, however, brief Tennessee law, presumably because Andy's rights to payment may be contingent on its factoring agreement with NBT. Thus, for the purposes of this Motion, the Court will assume that Tennessee law applies.

### C. Analysis

Movants make the same argument in their Motion as NBT and Peak did in their Motion to Approve Joint Settlement.[15] Essentially, Movants claim that NBT purchased, and thus owns, *all* of the open Peak invoices. Movants argue that Andy has "no right" to payment on Peak's invoices; rather, NBT is the only entity who can force payment. As the Court noted in its Order Denying the Joint Motion to Approve Settlement, the parties dispute how many invoices NBT owns and how many invoices are subject to a perfected security interest in favor of NBT under the factoring agreement. NBT's status as owner of the invoices implicates different rights than

---

[14] Brokerage Agreement ¶ 18.

[15] Neither of the parties has explained the legal standard for establishing a suit on sworn account as set forth in the Tennessee Code. *See* Tenn. Code Ann. § 24-5-107. The statute "was intended to furnish an easy and inexpensive mode for collecting debts when they are justly due and no real defense exists, unless the account is denied on oath, and thus the plaintiff is put on notice to make the necessary proof." *State ex rel. Finkelstein v. Donald*, No. 02a01-9807-CH-00203, 1999 Tenn. App. LEXIS 262, at *11 (Tenn. Ct. App. 1999) (citing *Foster & Webb v. Scott Cnty.*, 65 S.W. 22 (1901)). Furthermore, under the statute, "a plaintiff can obtain judgment in a suit on a sworn account without the necessity of calling any witnesses unless the defendant files a sworn denial of the account or appears at the hearing and orally denies the account under oath." *Clark Power Servs. v. Mitchell*, No. E2007-01489-COA-R3-CV, 2008 Tenn. App. LEXIS 313, at *7 (Tenn. Ct. App. 2008).

NBT's status as a secured party. On the unknown number of invoices potentially held as collateral, Andy would still have rights to payment despite NBT's security interest. Furthermore, the parties dispute whether Andy defaulted on its factoring agreement and whether Andy and NBT agreed that NBT could proceed against collateral absent default. These disputes give rise to a genuine issue of material fact on Peak's assertion that only NBT may force Peak to pay. Thus, Movants' Motion for Summary Judgment on Andy's suit on sworn account is **DENIED**.

## II. Negligent and Fraudulent Misrepresentation

### A. The Parties' Arguments

#### 1. Negligent Misrepresentation

Andy originally set forth a claim of negligent misrepresentation. Movants addressed the claim in their brief, but Andy abandoned the claim in its response. Therefore, Movants' Motion for Summary Judgment as to Andy's negligent misrepresentation claim is **GRANTED**.

#### 2. Fraudulent Misrepresentation

The Movants argue that they are entitled to summary judgment on Andy's fraudulent misrepresentation claim because Peak, through Mr. Steve Lindsey, did not falsely state a past or existing fact. Andy claims that it relied on a statement made by Mr. Steve Lindsey, a Peak representative, to Linh Dang, a representative of Andy, between the first and second thefts of cargo. Mr. Lindsey gave assurance that, at that time, Peak would not offset:

> Per our discussion, we will not offset payment on previous or future loads transported by Andy Transport in lieu of the pending claim. I hope to work swiftly to resolve the claim and continue our business relationship. I will forward the necessary documentation as soon as I receive it.[16]

---

[16] Exhibit 1 to Affidavit of Linh Dang (D.E. # 169-3).

8

Peak contends that on the date of the email, November 28, 2014, the second theft was not foreseeable. Peak did not contemplate offsetting for losses on Andy's accounts until after the second theft on January 5, 2012. Thus, when Lindsey made his assertion, he was not misstating a past or existing fact. Peak states that the second theft was unforeseeable, that it did not contemplate offsetting until after the second theft, and that Peak did not assert a right to offset until after the second theft.

Andy counters by arguing that Peak did not pay invoices in its possession that were due and payable prior to the second theft. In other words, Peak *did* offset invoices between the first and second thefts. Thus, Andy contends Lindsey misstated a past or existing fact about the already open invoices. Neither party, however, addresses the application of Indiana's economic loss rule, which the court holds is determinative.

### B. Choice of Law

The parties have briefed the misrepresentation claim based on both Tennessee and Indiana law. Before the Court can analyze the substance of Andy's misrepresentation claim, it must determine which state's law applies to the claim. A federal court sitting in diversity applies the choice of law rules of the forum state.[17] For tort cases, Tennessee follows the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws.[18] Under the approach, the law of the place of injury will normally apply unless another state has a more significant relationship to the occurrence and the parties.[19] In analyzing the relationship,

---

[17] *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009).

[18] *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 474 (Tenn. Ct. App. 2003) (citing *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992)).

[19] Other Restatement sections treat individual torts, providing a default rule for the specific tort in question. For example, for fraud and misrepresentation, section 148 provides that

9

Tennessee courts take into account several contacts listed in Restatement section 145, which explains the guiding principles for torts.[20] These contacts include (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship between the parties is centered.[21] The Court considers all of the contacts "according to their relative importance with respect to the particular issue."[22]

First, the Court notes that the injury in question—Andy's alleged losses as a result of Peak's setoff—occurred in California. Thus, unless a different state has a more significant relationship to the occurrence and the parties, California law would apply. But here, while the alleged injury "occurred" in California—which is also Andy's domicile—the conduct causing the alleged injury occurred in Indiana. Indiana is also the place where the parties' relationship is centered.[23] Notably, the parties did not even consider California law. Instead, they analyze the claim under both Indiana and Tennessee law. Tennessee has virtually no relationship to this

---

if the misrepresentation and the action in reliance occurred in the same state, that state's law applies. Restatement (Second) of Conflict of Laws § 148(1). It then provides that, as here, "if the plaintiff's action in reliance [on the misrepresentation] took place in whole or in part in a state other than that where the false representations were made," the forum is to consider other contacts. *Id.* § 148(2). The Court is unaware of any Tennessee court's treatment of section 148, but courts appear to rely upon section 145's general factors for most torts.

[20] *Gov't Emps. Ins. Co. v. Bloodworth*, No. M2003-02986-COA-R10-CV2007, 2007 Tenn. App. LEXIS 404, at *84 (Tenn. Ct. App. June 29, 2007).

[21] *Hataway*, 830 S.W.2d at 59 (citing Restatement (Second) of Conflict of Laws § 145 (1971)).

[22] Restatement (Second) of Conflict of Laws § 145 (1971).

[23] Although this is not a contract action, the parties' relationship is centered where the parties' brokerage agreement was formed—in Indiana. Furthermore, the brokerage agreement provides that the laws of Indiana will apply in the event of dispute.

third-party counterclaim of fraudulent misrepresentation; its only relevance stems from Andy's relationship with NBT. The Court thus holds that Indiana law applies to this tort claim, as Indiana is the state with the most significant relationship to the parties and to the occurrence.

**C. Analysis**

Movants argue that they are entitled to judgment as a matter of law on Andy's claim of fraudulent misrepresentation. To establish fraudulent misrepresentation under Indiana law, Andy must prove that (1) Movants "made false statements of past or existing material facts"; (2) Movants "made such statements knowing them to be false or made them recklessly without knowledge as to their truth or falsity"; (3) Movants "made the statements to induce [Andy] to act upon them"; (4) Andy "justifiably relied and acted upon the statements"; and (5) Andy "suffered injury."[24] Andy's alleged injury, however, is pure economic loss stemming from the rights of the parties—rights rooted in their brokerage agreement.

In the Movants' discussion of Andy's negligent misrepresentation claim, they state that Andy may not recover because the economic loss doctrine bars such recovery. The economic loss doctrine, however, applies equally to Andy's fraudulent misrepresentation claim. The doctrine "precludes tort liability for purely economic loss—that is, pecuniary loss unaccompanied by any property damage or personal injury."[25] Under Indiana law, "[i]n the context of contract disputes, the doctrine has been phrased as requiring that where a contract

---

[24] *Verrall v. Machura*, 810 N.E.2d 1159, 1163 (Ind. Ct. App. 2004) (citing *Adoptive Parents of M.L.V. v. Wilkens*, 598 N.E.2d 1054 (Ind. Ct. App. 1992)).

[25] *Stender v. BAC Home Loans*, No. 2:12-cv-41, 2013 U.S. Dist. LEXIS 30353, at *10 (N.D. Ind. Mar. 6, 2013) (citing *Indianapolis-Marion Cnty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 727 (Ind. 2010)).

11

exists, the contract is the only available remedy."[26] Indiana has firmly applied the doctrine to bar recovery of economic loss when the plaintiff sues for negligent misrepresentation, with some exceptions;[27] it has never directly addressed whether it would apply the doctrine to a fraudulent misrepresentation claim alleging purely economic loss. Furthermore, "[i]n states adopting the economic loss rule, courts struggle with the questions of if, when, and how the economic loss rule should apply to claims arising out of a defendant's fraudulent conduct."[28] Under Indiana law, however, applying the doctrine to the specific facts of this claim fits squarely with the doctrine's rationale.

The fraudulent misrepresentation claim before the Court is, in essence, a tort claim disguising the issue of whether NBT had the right to setoff in the contract. Instead of relying on the contract binding itself and Peak, Andy attempts to recover in tort. Andy does not claim that it was fraudulently induced into the contract, and it seemingly abandons its fraudulent misrepresentation claim in its own Motion for Partial Summary Judgment.[29] Therefore, the rationale of the economic loss doctrine under Indiana law—that "contract law governs damage to the product or service itself and purely economic loss arising from the failure of the product or

---

[26] *Id.* (citing *Thalheimer v. Halum*, 973 N.E.2d 1145, 1151 (Ind. Ct. App. 2012)).

[27] *See Indianapolis-Marion Cnty. Pub. Library*, 929 N.E.2d at 742; *see also* Black's Law Dictionary 531 (9th ed. 2009) ("Many states recognize an exception to this rule when the defendant commits fraud or negligent misrepresentation, or when a special relationship exists between the parties (such as an attorney-client relationship).").

[28] R. Joseph Barton, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 Wm. & Mary L. Rev. 1789, 1790 (2000).

[29] Mem. in Supp. of Mtn. for Partial Summ. J. 14 n.3 ("Upon Andy's review of the relevant case law, it appears that the Economic Loss Doctrine is equally applicable to fraudulent misrepresentation, and thus bars such a claim when only economic losses are alleged.").

service to perform as expected"[30]—persuades the Court that the doctrine also applies to Andy's claim of fraudulent misrepresentation. Thus, Movants' Motion for Summary Judgment on Andy's fraudulent misrepresentation claim is **GRANTED**.

## III. Unjust Enrichment

### A. The Parties' Arguments

Movants argue that they are entitled to summary judgment on Andy's final counterclaim of unjust enrichment. Movants argue that Peak and Andy's brokerage agreement supersedes the equitable claim for unjust enrichment. Furthermore, the Movants argue that Andy's unjust enrichment claim is essentially a claim for payment of freight charges. Those charges, Movants argue, are governed by Andy and NBT's factoring agreement, under which at least some accounts were sold and the rest taken as collateral.

Andy responds that if the Joint Settlement is approved, then its unjust enrichment claim would prevent the inequity of losing its right to payment. Andy claims that despite the existence of a contract, its unjust enrichment claim is still valid. Furthermore, Andy restates that it disputes the amount of invoices that NBT actually owns.

In its reply, Peak argues that the Court, if it had approved the proposed settlement, would have been enforcing the contracts—the brokerage agreement and the factoring agreement—rather than invalidating them. Thus, there would be no unjust enrichment, as Andy would not have lost anything that it had a right to. The brokerage agreement and the factoring agreement govern the subject of the litigation, Peak argues, and no party has claimed that either agreement is unenforceable. This, Peak contends, precludes Andy from proceeding on an equitable claim of unjust enrichment.

---

[30] *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 153 (Ind. 2005).

B. Analysis

Andy claims that Peak realized a windfall when Andy continued hauling freight without receiving any compensation. Andy states in its brief that the brokerage agreement is the applicable contract as between Peak and Andy. It also states that "if the settlement is approved, then Andy should be allowed to proceed against Peak on its unjust enrichment claim." The Court, however, did not approve the Joint Motion to Approve Settlement. Andy's rights in regard to its dispute with Peak are determined by the brokerage agreement. Thus, Movants' Motion for Summary Judgment as to Andy's unjust enrichment claim is **GRANTED**.

## CONCLUSION

Peak and Summitt's Motion for Summary Judgment on all of Andy's counterclaims is **GRANTED IN PART, DENIED IN PART**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: October 20, 2014.