| | |
|---|---|
| **NATIONAL BANKERS TRUST CORP.,** | ) |
| | ) |
|        **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **PEAK LOGISTICS, LLC,** | ) |
| **SUMMITT TRUCKING LLC,** | ) |
| **PACER TRANSPORTATION** | ) |
| **SOLUTIONS INC.,** | )       **No. 12-2268** |
| **ZAPPOS.COM, INC., and** | ) |
| **DECKERS OUTDOOR, INC.,** | ) |
| | ) |
|        **Defendants.** | ) |
| | ) |
| **and** | ) |
| | ) |
| **PEAK LOGISTICS, LLC,** | ) |
| | ) |
|        **Third-Party Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **ANDY TRANSPORT, INC.,** | ) |
| | ) |
|        **Third-Party Defendant.** | ) |

**ORDER GRANTING IN PART AND DENYING IN PART ANDY'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT**

Before the Court is Third-Party Defendant Andy Transport, Inc.'s ("Andy") Motion for

Partial Summary Judgment as to Peak Logistics, LLC ("Peak") and Summitt Trucking LLC's

("Summitt") Claims, filed June 12, 2014 (D.E. # 178). Peak filed a Response in Opposition to

the Motion (D.E. # 179), to which Andy filed a Reply (D.E. # 183). Futhermore, on October 2,

2014, National Bankers Trust ("NBT") filed its Notice of Joinder in Andy's Motion (D.E. #

194), to which Peak filed yet another Response (D.E. # 197). For the reasons stated below, Andy's Motion for Partial Summary Judgment is **GRANTED IN PART, DENIED IN PART**.

## BACKGROUND

The third-party litigation at issue stems from original litigation filed by NBT against Defendants, including Peak. Peak then filed a third-party complaint against Andy (D.E. # 37), and Andy answered and counterclaimed against Defendants, including Peak and Summitt (D.E. # 50).[1] Andy seeks summary judgment on several issues in Peak's Third-Party Complaint: (1) whether Peak is entitled to its alleged lost profits; (2) whether Andy must indemnify Peak for the litigation; and (3) whether Peak may recover for Andy's alleged fraudulent misrepresentation and negligence.

NBT is engaged in the business of factoring for motor carriers. (Pl.'s Compl. ¶ 1). NBT purchases its clients' accounts receivable at a discount and takes a security interest in its clients' assets to secure the purchase price. (*Id.* ¶ 15). NBT remits a portion of the purchase price, known as the "advance rate," at the time of purchase, reserving a portion of the purchase price as further security. (*Id.* ¶ 16). NBT releases the reserved funds to its clients once the shipper pays the account. (*Id.* ¶ 17). One such client was Andy. On August 15, 2011, NBT and Andy entered into a factoring agreement. (*Id.* ¶ 18). In October 2011, Peak and Andy entered into a Broker-Carrier Agreement ("Agreement"). (Andy's Statement of Undisputed Facts ¶ 1). This Agreement between Peak and Andy is the subject of Peak's claims against Andy and Andy's counterclaims against Peak.

---

[1] Throughout this Order, the Court refers only to Peak as the non-moving party. Andy claims that Summitt is the alter-ego of Peak, and thus Summitt's alleged liability is based solely on the actions of Peak.

Andy's relationship with NBT, on the other hand, is governed by the parties' factoring agreement. Under the factoring agreement, Andy sold at least some of its receivables—including accounts that Peak owed to Andy—to NBT. (Joint Response to Mot. for Partial Summ. J. 3). The factoring agreement gave NBT, as assignee, the right to collect on at least some Andy's open accounts, although the parties dispute the number of accounts actually purchased.[2] NBT notified Peak of its purchase of the accounts from Andy, triggering Peak's obligation to pay NBT what it originally owed Andy.

On November 23, 2011, and January 5, 2012, Andy hauled two separate loads of Defendant Zappos.com's (Zappos) shoes—loads brokered by Peak. (*Id.*). Both were stolen. (*Id*). Peak claims that after the first theft, it communicated to Andy, in writing and verbally, that Peak would require implementation of additional security measures on Zappos loads to prevent future losses. (Peak's Third-Party Compl. ¶ 12). Andy, Peak claims, did not implement or follow those additional measures, despite assuring Peak that it would do so. (*Id.* ¶ 13–19). Andy continued to carry the loads until the second theft. (*Id.* ¶ 18).

Andy states that its insurer paid $250,000.00 on each of the two thefts, but that Peak had to pay $82,333.45 in excess of Andy's insurance coverage. (*See id.* ¶ 20). While Andy's insurance claims were still pending, Peak began withholding payment on its open invoices with Andy, which affected both Andy and NBT. Peak continues to assert a right of setoff for the cargo loss *and* for the loss of business that it claims it incurred as a result of Andy's alleged breach of the Broker-Carrier Agreement. (*Id.* ¶ 28). The alleged loss of business stems from Peak's claim that Pacer Transportation Systems, Inc. ("Pacer") stopped doing business with Peak after the cargo thefts. When NBT did not receive payment on the factored receivables, it sued

---

[2] The parties dispute how many invoices that Andy sold or assigned to NBT as compared to how many invoices served as collateral in which NBT took a security interest.

Peak on sworn account for $187,600.00. (Pl.'s Compl. ¶ 44). Peak then brought a third-party complaint against Andy, and Andy counterclaimed against the Defendants/Third-Party Plaintiffs, including Peak. The Court granted in part and denied in part Peak's Motion for Summary Judgment on Andy's counterclaims, and it does the same for Andy's Motion for Partial Summary Judgment on Peak's claims.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[3] In reviewing a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party,[4] and it "may not make credibility determinations or weigh the evidence."[5] When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[6] It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[7] These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence

---

[3] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 360 (6th Cir. 2014).

[4] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[5] *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).

[6] *Celotex*, 477 U.S. at 324.

[7] *Matsushita*, 475 U.S. at 586.

that the nonmoving party is entitled to a verdict.[8]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[9]  In this Circuit, the nonmoving party must "put up or shut up" as to the critical issues of the claim.[10]  The Court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[11]

## ANALYSIS

### I. Contractual Claims

In its third-party complaint, Peak seeks a declaratory judgment on two issues, both rooted in the Broker-Carrier Agreement.  Peak claims that Andy breached the Agreement, and therefore the Agreement affords Peak the remedies contained therein.  Andy now asks for summary judgment as to these two issues.  First, Andy asks the court to decide as a matter of law that Peak is not entitled to offset payments for its alleged lost profits.  Second, Andy seeks summary judgment on whether the indemnity provision in the Broker-Carrier Agreement requires Andy to indemnify Peak.

---

[8] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[9] *Id.* at 251–52.

[10] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[11] *Celotex*, 477 U.S. at 322.

### A. Applicable Law

#### 1. Carmack Amendment

In its Notice of Joinder in Andy's Motion for Partial Summary Judgment, NBT argues that Peak's common-law claims against Andy are preempted by federal law under the Carmack Amendment to the Interstate Commerce Act, which governs shippers' liability to carriers for damage to or loss of interstate shipments.[12]   Indeed, this Court has held that the Carmack Amendment preempts shippers' state common-law suits against interstate commercial carriers of property.[13]   The Carmack Amendment, in an attempt to "relieve shippers of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment of goods,"[14]   imposes absolute liability on a carrier for the "actual loss or injury to the property" sustained in transit.[15]   NBT asserts, then, that Peak may recover only actual damages from Andy under federal law, rather than consequential damages like its alleged loss of business.

---

[12] 49 U.S.C. § 14706; *see UPS Supply Chain Solutions, Inc. v. Megatrux Transp., Inc.*, 750 F.3d 1282, 1285–86 (11th Cir. 2014).   Neither party has alleged that the shipment was purely intrastate.

[13] *Racing Head Serv., LLC v. Mallory Alexander Int'l Logistics*, No. 09-2605-STA-tmp, 2012 U.S. Dist. LEXIS 6713, at *54 (W.D. Tenn. Jan. 20, 2012) (citing *W.D. Lawson & Co. v. Penn Cent. Co.*, 456 F.2d 419, 421 (6th Cir. 1972)).

[14] *Reider v. Thompson*, 339 U.S. 113, 119 (1950).

[15] 49 U.S.C. § 14706(a)(1); *see Camar Corp. v. Preston Trucking Co.*, 221 F.3d 271, 277 (1st Cir. 2000).   NBT also notes that "[a] Carmack claim does not absolutely preclude recovery of special or consequential damages" and then embarks on a discussion of knowledge and foreseeability of such damages as the Court does below.

Federal preemption is an affirmative defense;[16] therefore, Andy and NBT bear the burden of proof.[17]  The Carmack Amendment preempts shippers' common-law claims against carriers, but federal courts have labored over the issue of whether *brokers*' claims against carriers are likewise preempted.[18]  In *Excel, Inc. v. Southern Refrigerated Transport*, the District Court for the Southern District of Ohio determined that the Carmack Amendment did not impliedly preempt a broker's breach-of-contract claim against a carrier.[19]  The court held that a "master agreement" between the broker and the carrier, much like the Broker-Carrier Agreement in this case, "falls outside of the shipper-carrier relationship and outside the preemptive field of the Carmack Amendment."[20]  It also noted that the agreement was "a negotiated contract that establish[ed] an ongoing business relationship between sophisticated parties," and that the agreement "did not focus on shipping under a bill of lading," the instrument that establishes

---

[16] *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 913 (6th Cir. 2007).  The failure to affirmatively raise preemption does not necessarily result in waiver.  *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993).  While it may be not too late to raise the preemption issue in the summary judgment phase, *Lindley v. Am. Home Mortg. Servicing Inc.*, No. 3:10-1108, 2012 U.S. Dist. LEXIS 165588, at *6–7 (M.D. Tenn. Nov. 20, 2012), NBT—not Andy—has raised the defense late in the proceedings.  Nevertheless, the Court will take up the argument after it gave Peak an opportunity to respond.

[17] *Brown*, 481 F.3d at 913.

[18] *See Exel, Inc. v. S. Refrigerated Transp., Inc.*, No. 2:10-cv-994, 2014 U.S. Dist. LEXIS 119024, at *13 (S.D. Ohio Aug. 26, 2014) (citing several cases with different holdings on the issue).

[19] *Excel, Inc. v. S. Refrigerated Transp., Inc.*, No. 2:10-cv-994, 2012 U.S. Dist. LEXIS 104740, at *15 (S.D. Ohio July 27, 2012).  The Court noted preliminarily that the Carmack Amendment does not expressly preempt state law claims by brokers.  *Id.* at *12.

[20] *Id.* at * 15.

liability under the Carmack Amendment.[21]  In other words, the broker's claims were distinct from claims that the Carmack Amendment intends to preempt.

In Andy and Peak's Broker-Carrier Agreement, the parties specify that the "Carrier assumes the liability of a carrier pursuant to the Carmack Amendment . . . for loss, delay, damage to or destruction of any and all of Customer's goods or property while under Carrier's care, custody or control."[22]  But just after this recitation, the Broker-Carrier Agreement also clarifies that the "Carrier shall be liable to Broker for all economic loss, including consequential damages that are incurred by Broker or the Customer for any freight loss, damage or delay claim."[23]  Such language persuades the Court that the Carmack Amendment's limitation of liability for *carriers* does not preempt Peak's contractual claims.  Those claims are based on Peak's independent and once-ongoing relationship with one of its business partners—a relationship defined by the Broker-Carrier Agreement and agreed to by Andy.[24]  Andy has made no allegation that Peak is simply enforcing the shipper's claims as assignee; instead, Peak seeks damages for its own loss of business.  As another District Court has explained, separate claims based on broker-carrier contracts do not raise the concern addressed by Carmack liability:  a carrier will not be "'placed in the untenable position of having to determine what [its] liability may be in many jurisdictions with differing laws'" because "parties to the contracts may reasonably expect that their contracts will be interpreted consistently by the law of the

---

[21] *Id.*; *see* 49 U.S.C. § 1706(a)(1) (providing recovery "under the receipt or bill of lading").

[22] Broker-Carrier Agreement ¶ 9.

[23] *Id.*

[24] *See Intransit v. Excel N. Am. Rd. Transp., Inc.*, 426 F. Supp. 2d 1136, 1141 (D. Or. 2006).

jurisdiction in which the contract was made."[25]  Having determined that the Carmack Amendment does not preempt Peak's contractual claims, the Court must decide which state's law applies to such claims.

### 2. Choice of Law

Both the lost profits issue and the indemnity issue are rooted in the Broker-Carrier Agreement, a contract between the two parties.  The Broker-Carrier Agreement calls for the application of Indiana law in the event of a dispute related to the agreement.  A federal court sitting in diversity applies the choice of law rules of the forum state.[26]  Tennessee courts follow the rule of *lexi loci contractus*:  the law of the state in which the contract was executed is presumed to be the applicable law, "absent a contrary intent."[27]  Furthermore, a choice-of-law provision in the Broker-Carrier Agreement calls for the application of Indiana law.  Tennessee courts will honor a contractual choice-of-law provision "if the state whose law is chosen bears a reasonable relation to the transaction and absent a violation of the forum state's public policy."[28]  Here, neither party objects to the application of Indiana law, and Indiana is the place of contracting.  Thus, Indiana substantive law applies to the claims.

---

[25] *Transcorr Nat'l Logistics, LLC v. Chaler Corp.*, No. 1:08-cv-00375, 2008 U.S. Dist. LEXIS 104472, at *7–8 (S.D. Ind. Dec. 19, 2008) (quoting *Intransit*, 426 F. Supp. 2d at 1141).

[26] *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009).

[27] *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457 (Tenn. Ct. App. 2003) (citing *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973)).

[28] *Bright v. Spaghetti Warehouse*, No. 03A01-9708-CV-00377, 1998 Tenn. App. LEXIS 286, at *13 (Tenn. Ct. App. Apr. 29, 1998) (citing *Arcata Graphics v. Heidelberg Harris*, 874 S.W.2d 15, 27 (Tenn. Ct. App. 1993)).

**B. Analysis**

**1. Lost Profits**

Peak's claim for lost profits stems from the loss of cargo while in Andy's hands. Peak alleges that it sustained "damages to business reputation, lost profits, and other consequential damages as a result of Andy's acts and omissions."[29] Andy seems to refer to this group of damages collectively as "lost profits." It is a group of damages that relate to Peak's alleged loss of business with Pacer, its former client. Essentially, Andy asks the Court to determine as a matter of law (1) that the Agreement does not provide for such damages, and (2) that such damages were not foreseeable. Andy does not concede that it breached the Agreement; however, for the purposes of this section, the Court assumes that Andy did breach the Agreement.

At issue is the interpretation of paragraph 9 of the Broker-Carrier Agreement. In the Agreement, Andy is the "Carrier," and Peak is the "Broker":

> Carrier shall pay to Broker, or allow Broker to deduct from the amount Broker owes Carrier, Customer's full actual loss for the kind and quantity of commodities so lost, delayed, damaged or destroyed. Carrier shall be liable to Broker for all economic loss, including consequential damages that are incurred by Broker or the Customer for any freight loss, damage or delay claim.[30]

First, Andy argues that paragraph 9 of the Broker-Carrier Agreement does not permit recovery of economic loss "as a result of Peak losing brokerage business." Peak, on the other hand, argues that such consequential damages are expressly provided for in the Agreement.

---

[29] Peak's Third-Party Compl. ¶ 24.
[30] Broker-Carrier Agreement ¶ 9.

The interpretation of a contract is generally a question for the court,[31] and "[t]he ultimate goal of any contract interpretation is to determine the intent of the parties at the time that they made the agreement."[32]   Indiana courts read the plain language of the contract in context, "construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole."[33]   If a reasonable person could find that the contract is subject to more than one interpretation, then it is ambiguous, and the Court must look to the evidence of the parties' intent.[34]   There is no question that paragraph 9 of the Agreement allows Peak to recover some sort of "consequential damages" after a breach.   The real question is whether those "consequential damages" include only economic losses from the sale of the cargo that was actually stolen, or whether they include economic losses from Peak's alleged lost brokerage business with Pacer.

Andy bases its construction of the Agreement on foreseeability.   It argues that the parties did not intend for "consequential damages" to include Peak's loss of business with Pacer because such damages were not foreseeable at the time of contracting.   Generally, consequential economic loss "may include lost profits and loss of goodwill or business reputation."[35]   But Indiana courts follow the rule of *Hadley v. Baxendale* in limiting consequential damages to

---

[31] *Clyde E. Williams & Assocs. v. Boatman*, 375 N.E.2d 1138 (Ind. Ct. App. 1978) (citing *Ebert v. Grain Dealers Mut. Ins. Co.*, 303 N.E.2d 693, 698 (Ind. Ct. App. 1973)).

[32] *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012).

[33] *Id.* (citing *Trustcorp Mortg. Co. v. Metro Mortg. Co.*, 867 N.E.2d 203, 213 (Ind. Ct. App. 2007)).

[34] *Id.*

[35] Black's Law Dictionary 531 (9th ed. 2009).

reasonably foreseeable economic losses;[36] therefore, whether or not Peak may actually recover for the consequential damages it demands is a question of foreseeability. While the language of the contract itself sheds light on the parties' intentions to allow consequential damages,[37] "the question of whether the injury suffered was a natural and proximate result of [a party's] breach which can fairly be said to have been within the contemplation of the parties at the time the contract was entered *is a] question[] of fact to be resolved by the jury.*"[38] While Andy claims that two stolen truckloads were completely unforeseeable and that it had "no knowledge of Peak's relationship with Pacer,"[39] a jury will have to determine, factually, "whether the damages suffered were within the contemplation of the parties."[40] Andy's Motion for Partial Summary Judgment on the issue of lost profits is **DENIED**.

### 2. Indemnity

#### a. Contractual Indemnity

Andy asks the court to enter summary judgment on Peak's indemnity claim. The Broker-Carrier Agreement's indemnity provision states the following:

---

[36]*See Johnson v. Scandia Assocs.* 717 N.E.2d 24, 31 (Ind. 1999) (citing *Strong v. Commercial Carpet Co.*, 322 N.E.2d 387, 391–92 (1975)).

[37] *ViaStart Energy, LLC v. Motorola, Inc.*, No. 1:05-cv-1095, 2006 U.S. Dist. LEXIS 78331, at *14–15 (S.D. Ind. Oct. 26, 2006).

[38] *Strong*, 822 N.E.2d at 392 (emphasis added); *see also Wilson v. Kauffman*, 296 N.E.2d 432, 437 (Ind. Ct. App. 1973) ("Strictly speaking the interpretation of the contract is not submitted to the jury insofar as the question is one of construction and a question of law, but, the facts on which that construction rests must be determined by the jury.").

[39] Apparently NBT and Peak also believed, even after the first theft, that "the second theft was not foreseeable." (Mem. in Supp. of Joint Mot. for Summ. J. as to Andy's Counterclaims 11, ECF No. 164-1). Peak argues, however, that this statement did not involve foreseeability of lost profits. (Joint Response to Mot. for Summ. J. 6 n.1, ECF No. 179).

[40] *Strong*, 822 N.E.2d at 392 n.2 (citing *Hadley v. Baxendale*, (1854) 156 Eng. Rep. 145).

> [Andy] shall defend, indemnify, and hold [Peak] harmless from
> and against all loss, liability, damage, claims, fines, costs or
> expenses, including attorney's fees, arising out of or in any way
> related to (i) the performance of services pursuant to this
> Agreement and (ii) the performance or breach of this Agreement,
> by [Andy], its employees or independent contractors working for
> [Andy] (collectively, the "Claims"), including, but not limited to,
> Claims for or related to personal injury (including death), property
> damage and Carrier's possession, use, maintenance, custody or
> operation of the Equipment.

Peak claims that it should be indemnified for its attorney fees and losses for the suit brought by NBT against Peak. Under Indiana law, "indemnification clauses are strictly construed and the intent to indemnify must be stated in clear and unequivocal terms."[41] Indiana courts use the standard rules of contract construction in interpreting indemnity provisions, and such interpretation is a question of law.[42]

Generally, there are two types of indemnification coverage: first-party coverage and third-party coverage. Under Indiana law, it is "the general understanding" that indemnification clauses cover third-party liability.[43] In other words, "'indemnity is a form of compensation in which a first party is liable to pay a second party for a loss or damage the second party incurs to a third party.'"[44] Here, the Court agrees with Andy that the indemnity provision above is ambiguous as to whether it applies to first-party claims. As in *L.H. Controls v. Custom Conveyor*, there is no plain language in the provision "clearly and unambiguously stating" that

---

[41] *Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1132 (Ind. 1995) (citing *Wilson Leasing Co. v. Gadberry*, 437 N.E.2d 500, 501 (Ind. Ct. App. 1982)).

[42] *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1047 (Ind. Ct. App. 2012).

[43] *Id.* (citing *Indianaopolis City Mkt. Corp. v. MAV, Inc.*, 915 N.E.2d 1013, 1023 (Ind. Ct. App. 2009)).

[44] *Id.* (quoting 41 Am. Jur. 2d *Indemnity* § 1 (2005)).

Andy is required to cover the costs "associated with any cause of action asserted even by parties to the agreement in a breach of contract action between the parties."[45]  After that finding, the Indiana court in *L.H. Controls* construed the agreement against the drafter and concluded that it did not cover first-party claims.[46]  The Court finds that the same analysis applies to the indemnity provision in the Broker-Dealer Agreement.  Thus, Andy is not required to indemnify Peak in its lawsuit against Andy.[47]

Peak also claims, however, that the indemnification provision requires Andy to indemnify Peak in its litigation with NBT.  NBT, Peak claims, is a third-party.  Indeed, NBT was not a party to the Broker-Carrier Agreement.  But Andy argues that the indemnity provision in the Agreement does not cover Peak's costs associated with NBT's lawsuit, since NBT is only enforcing the rights assigned to it by Andy.

It is a "well-settled principle of contract law that a valid assignment gives the assignee neither greater nor lesser rights than those held by the assignor."[48]  NBT is "stepping into Andy's shoes," and thus for the claims that NBT brings against Peak, NBT is acting as Andy.  NBT purchased invoices representing payments owed by Peak to Andy, and for those invoices—the ones *owned* by NBT—Andy does not have the right to recover.  Instead, Andy assigned its rights to NBT.  In support of its contention that NBT is a third party, Peak contends that "Andy and NBT have conflicting interests."  While it is true that Andy does not control NBT's actions,

---

[45] *Id.*

[46] *Id.*

[47] Peak never argues in its Response that the Court should interpret the indemnity provision in the Brokerage Agreement as covering first-party indemnification.  Rather, it only argues that NBT's claims against Peak constitute third-party litigation.

[48] *In re Marriage of Pettit*, 626 N.E.2d 444, 447 (Ind. 1993).

Andy and NBT do not have conflicting interests as to whether NBT pays the accounts. Both parties want Peak to pay the entire amount of invoices that they allege remain open. These include the invoices allegedly payable to Andy and the invoices that Andy allegedly sold to NBT. Thus, under the specific facts of this case, NBT is a first party with respect to the indemnity agreement. Andy's Motion for Partial Summary Judgment as to Peak's contractual indemnity claims is **GRANTED**.

### b. Common-law Indemnity

Andy also seeks summary judgment on Peak's common-law, or "implied-indemnity" claim. Peak argues that dismissing Peak's implied indemnity claim would be premature because the Court has not ruled that Peak acted wrongfully in offsetting its alleged losses. But generally, Indiana law allows a party to bring an action for common-law indemnification only "in the absence of an express contractual or statutory right to indemnity."[49] As described in the previous section, the parties are subject to an indemnification provision in the Broker-Dealer Agreement. That provision only applies to third-party indemnity. Thus, in the current action, Peak must defend its own claim for its alleged loss of business. Andy's Motion for Partial Summary Judgment as to common-law indemnity is **GRANTED**.[50]

---

[49] *INS Investigations Bureau, Inc. v. Lee*, 784 N.E.2d 566, 575 (Ind. Ct. App. 2003); *see also* 41 Am. Jr. 2d *Indemnity* § 20 ("The law will not imply a right of indemnity where the parties have entered into a written contract with express indemnification provisions.").

[50] Andy's Motion for Partial Summary Judgment only asks for a determination as a matter of law on the indemnity claims as they relate to Peak's claims for lost profits. (Mem. in Supp. of Mot. for Partial Summ. J. 3–4, ECF No. 178-1). Thus, in this Order, the Court has not interpreted the indemnity provision in the Broker-Carrier Agreement as to Peak's payment to Zappos for the deficit of $82,333.45 that was allegedly absorbed after Andy's insurance paid $500,000.

### III. Tort Claims

Peak makes two tort claims in its third-party complaint. It alleges (1) that Andy fraudulently misrepresented to Peak that it was implementing additional security measures, and (2) that Andy was negligent in failing to use reasonable care to prevent loss or damage to cargo in its possession. The economic loss doctrine applies to bar both claims.

#### A. Choice of Law

Before the Court can analyze the substance of Peak's tort claims, it must determine which state's law applies to the claims. A federal court sitting in diversity applies the choice-of-law rules of the forum state.[51] For tort cases, Tennessee follows the "most significant relationship" approach of the Restatement (Second) of Conflict of Laws.[52] Under the approach, the law of the place of injury will normally apply unless another state has a more significant relationship to the occurrence and the parties.[53] In analyzing the relationship, Tennessee courts take into account several contacts listed in Restatement section 145, which explains the guiding principles for torts.[54] These contacts include (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of

---

[51] *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009).

[52] *Messer Griesheim Indus. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 474 (Tenn. Ct. App. 2003) (citing *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992)).

[53] Other Restatement sections treat individual torts, providing a default rule for the specific tort in question. For example, for fraud and misrepresentation, section 148 provides that if the misrepresentation and the action in reliance occurred in the same state, that state's law applies. Restatement (Second) of Conflict of Laws § 148(1). It then provides that, as here, "if the plaintiff's action in reliance [on the misrepresentation] took place in whole or in part in a state other than that where the false representations were made," the forum is to consider other contacts. *Id.* § 148(2). The Court is unaware of any Tennessee court's treatment of section 148, but courts appear to rely upon section 145's general factors for most torts.

[54] *Gov't Emps. Ins. Co. v. Bloodworth*, No. M2003-02986-COA-R10-CV2007, Tenn. App. LEXIS 404, at *84 (Tenn. Ct. App. June 29, 2007).

incorporation and place of business of the parties, and (d) the place where the relationship between the parties is centered.[55]  The Court considers all of the contacts "according to their relative importance with respect to the particular issue."[56]

First, the Court notes that the injury in question—Peak's alleged losses as a result of Andy's negligence and fraudulent misrepresentation—occurred in Indiana, which is also Peak's place of business.  Thus, unless a different state has a more significant relationship to the occurrence and the parties, Indiana law will apply.  The conduct causing the injury—Andy's alleged negligence in failing to implement security measures and its alleged fraudulent misstatement—occurred in California, Andy's place of business.  Most importantly, however, Indiana is the place where the parties' relationship is centered.[57]  Both parties brief only Indiana law, a recognition of the importance of this last contact.  The Court thus holds that Indiana law applies to the tort claims, as Indiana is the state with the most significant relationship to the parties and to the occurrence.

**B.  Analysis**

Before even reaching the substance of the two tort claims—negligence and fraudulent misrepresentation—the Court examines the economic loss doctrine under Indiana law as it did in

--------------------------

[55] *Hataway*, 830 S.W.2d at 59 (citing Restatement (Second) of Conflict of Laws § 145 (1971)).

[56] Restatement (Second) of Conflict of Laws § 145 (1971).

[57] Although this is not a contract action, the parties' relationship is centered where the parties formed the Broker-Carrier Agreement—in Indiana.  Furthermore, the Agreement provides that the laws of Indiana will apply in the event of dispute.  The parties' reliance on Indiana law as determinative of Peak's tort *and* contract claims also gives weight to the Court's application of the economic loss doctrine.  *See infra* Part III.B.

ruling on Peak and Summitt's Motion for Summary Judgment.[58]   Although Andy clearly sets forth its argument that purely economic damages are barred by the economic loss doctrine, Peak fails to address the argument in its response.   The doctrine "precludes tort liability for purely economic loss—that is, pecuniary loss unaccompanied by any property damage or personal injury."[59]   Under Indiana law, "[i]n the context of contract disputes, the doctrine has been phrased as requiring that where a contract exists, the contract is the only available remedy."[60]

### 1. Fraudulent Misrepresentation

Indiana has firmly applied the doctrine to bar recovery of economic loss when the plaintiff sues for negligent misrepresentation, with some exceptions;[61] it has never directly addressed whether it would apply the doctrine to a fraudulent misrepresentation claim alleging purely economic loss.   Furthermore, "[i]n states adopting the economic loss rule, courts struggle with the questions of if, when, and how the economic loss rule should apply to claims arising out

---

[58] Andy also argued that the Court should grant summary judgment on Peak's fraudulent misrepresentation claim because the claim is not pled with sufficient particularity.  The Court does not decide on this ground, but it does note that Andy answered Peak's complaint without objecting to the sufficiency of its pleading under Rule 9(b).  Almost two years later, Andy claims that Peak's complaint does not plead with particularity.

[59] *Stender v. BAC Home Loans*, No. 2:12-cv-41, 2013 U.S. Dist. LEXIS 30353, at *10 (N.D. Ind. Mar. 6, 2013) (citing *Indianapolis-Marion Cnty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 727 (Ind. 2010)); *see also supra* note 43.

[60] *Id.* (citing *Thalheimer v. Halum*, 973 N.E.2d 1145, 1151 (Ind. Ct. App. 2012)).

[61] *See Indianapolis-Marion Cnty. Pub. Library*, 929 N.E.2d at 742; *see also* Black's Law Dictionary 531 (9th ed. 2009) ("Many states recognize an exception to this rule when the defendant commits fraud or negligent misrepresentation, or when a special relationship exists between the parties (such as an attorney-client relationship).").

of a defendant's fraudulent conduct."[62]   Under Indiana law, however, applying the doctrine to the specific facts of Peak's fraudulent misrepresentation claim follows logically from the doctrine's rationale.

Peak alleges that Andy fraudulently misrepresented that it would honor additional security procedures imposed by Peak.  Peak states that it relied on Andy's misrepresentation and suffered economic damages as a result.  Those damages include the loss that Peak absorbed when Andy's insurance did not cover the full repayment of value of the stolen loads, as well as Peak's alleged lost profits.   Both of these losses are "economic"—"pecuniary loss unaccompanied by any property damage or personal injury (other than damage to the product or service itself)."[63]   In essence, Peak's claim of fraudulent misrepresentation is a tort claim that coincides with Andy's duties under the Broker-Carrier Agreement.  In other words, Andy's alleged "breach" of a common-law duty is more adequately framed as an alleged breach of the Broker-Carrier Agreement, which is the real issue between the parties.[64]  Thus, the economic losses Peak alleges "are viewed as disappointed contractual or commercial expectations" and are barred by the economic loss doctrine.[65]   Andy's Motion for Partial Summary Judgment as to Peak's fraudulent misrepresentation claim is **GRANTED**.

---

[62] R. Joseph Barton, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 Wm. & Mary L. Rev. 1789, 1790 (2000).

[63] *Indianapolis-Marion Cnty. Pub. Library*, 929 N.E.2d at 726.

[64] Neither party chose to brief the court on the alleged misrepresentation's effect on the Broker-Carrier Agreement, which defines the duties of the parties and states that the Broker-Carrier Agreement "supersedes all other agreements."  *See* Broker-Carrier Agreement ¶ 15.

[65] *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 154 (Ind. 2005) (citing *Am. United Logistics, Inc. v. Catellus Dev. Corp.*, 319 F.3d 921, 926 (7th Cir. 2003)).

## 2. Negligence

Peak alleges negligence because "Andy, by and through its agents, employees or representatives failed to act reasonably under the circumstances in allowing the loads to be stolen."[66] But, as noted previously, under Indiana law plaintiffs cannot recover purely economic losses caused by defendants' negligence.[67] The Supreme Court of Indiana makes it clear that this applies not just to products liability actions, but also to negligence actions in the context of service agreements:

> Indiana law under the Products Liability Act and under general negligence law is that damage from a defective product or service may be recoverable under a tort theory if the defect causes personal injury or damage to other property, but contract law governs damage to the product or service itself and purely economic loss arising from the failure of the product or service to perform as expected.[68]

The Broker-Carrier Agreement imposes the same duty of care on Andy that Peak wishes to impose through common-law negligence. As with its fraudulent misrepresentation claim, the alleged breach of this common-law duty is also an alleged breach of the Broker-Carrier Agreement: Andy "agrees to use reasonable care and due diligence in the protection of said goods and shipments."[69] Peak's alleged economic losses, then, are better determined by the contractual rights of the parties. Andy's Motion for Partial Summary Judgment as to Peak's negligence claim is **GRANTED.**

---

[66] Peak's Third-Party Compl. ¶ 46.

[67] *Indianapolis-Marion Cnty. Pub. Library*, 929 N.E.2d at 726–27.

[68] *Gunkel*, 822 N.E.2d at 153.

[69] Broker-Carrier Agreement ¶ 20.

## CONCLUSION

For the reasons stated, Andy's Motion for Partial Summary Judgment is **GRANTED IN PART, DENIED IN PART.**

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: October 20, 2014.